UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| MALIBU MEDIA, LLC, | ) |
| Plaintiff, | ) Civil Action Case No.: 1:12-cv-22768-PAS |
| v. | ) |
| LEO PELIZZO, | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S OBJECTIONS
TO REPORT AND RECOMMENDATION RE:
DEFENDANT'S VERIFIED MOTION FOR ATTORNEY'S FEES AND COSTS**

i

I. **INTRODUCTION**

Plaintiff respectfully requests this Court deny Defendant's Objections to Report and Recommendation Re: Defendant's Verified Motion for Attorney's Fees and Costs. CM/ECF 54. The Honorable Magistrate Judge Simonton's Report and Recommendation correctly held that attorneys' fees under the Copyright Act should not be awarded and Defendant's Objection falls short of proving otherwise. Additionally, although Plaintiff respectfully disagrees with the imposition of sanctions under 28 U.S.C. § 1927, undersigned appreciates and has learned from the Court's point of view and does not contest the Court's holding. For the foregoing reasons, as explained more fully herein, Plaintiff respectfully requests this Court deny Defendant's Objection and uphold the Honorable Magistrate Judge Simonton's Report and Recommendation.

II. **FACTUAL BACKGROUND**

A. Plaintiff Had No Reason to Doubt the Veracity of the Subpoena Response

Although Hotwire's subpoena response "did not specify the date and/or time that Mr. Pelizzo's account was assigned the infringing IP address," there is no reason to believe that Hotwire produced identifying information for IP Address 24.238.22.207 on a date and time different than that listed on Plaintiff's subpoena. To the contrary, the response clearly indicated that it was producing information responsive to Plaintiff's subpoena – "Per the subpoena dated February 20, 2012 . . . below is the information Hotwire located for the following IP addresses." CM/ECF 54, at p. 4. Defendant's argument that "Plaintiff's cover letter included no instructions or specifics as to the relevant date and time to be targeted in the identification," is irrelevant. CM/ECF 54, at p. 3. Plaintiff's subpoena to Hotwire clearly indicated that they should produce "documents sufficient to identify the true name, address, telephone number and e-mail address of each person who was assigned one of the IP Addresses set forth on Exhibit A." CM/ECF 49-2. Exhibit A listed Defendant's IP address and "the relevant date and time to be targeted in the

1

identification" – IP Address 24.238.22.207 on 2/6/2012, 17:37 UTC.  *Id.*  Mr. Leo Pelizzo was identified as the internet subscriber assigned IP Address 24.238.22.207.

There was no reason for Plaintiff to "contact Hotwire to confirm that Mr. Pelizzo's account had been assigned the Infringing IP address at <u>exactly</u> '2/6/12, 17:37'."  CM/ECF 54, at p. 4 (underlining in original).  Hotwire responds to subpoenas in both civil and criminal cases and takes its obligations to do so seriously.  *See Malibu Media, LLC v. Mark Fitzpatrick*, 1:12-cv-22767-PAS, Deposition of Laurie M. Murphy ("Subsequent Murphy Depo."), Exhibit A, at p. 19:1-16.  Plaintiff had no reason to second-guess the information that it received.

B. <u>Defendant's Argument that Hotwire Did Not Identify Him on *Every* Hit Date Fails</u>

A. <u>The Mathematical Probability That Defendant's IP Address was Assigned to Another Hotwire Subscriber During the Infringement is Exceedingly Remote</u>

Plaintiff did not need to subpoena Hotwire for the identity of the internet subscriber assigned the subject IP address on each of the 337 infringement hit dates logged by IPP, Plaintiff's investigator.  The mathematical probability that Defendant's IP Address was assigned to another Hotwire subscriber at any time when the infringement was occurring is exceedingly remote.  To explain, as Defendant points out, Hotwire uses dynamic IP Addresses.  In other words, Hotwire's computer program allows—but does not require—Hotwire to assign a subscriber a different IP Address if the subscriber has not used his or her internet for at least 24 consecutive hours.  *See* Deposition of Laurie M. Murphy ("Murphy Depo."), at pp. 32-33, Exhibit B.  As of November 2012, there were approximately 47,000 Florida Hotwire subscribers.  *See* Declaration of Laurie M. Murphy ("Subsequent Murphy Decl."), CM/ECF 34-1, Exhibit C. And, the ratio of Hotwire IP addresses to subscribers in February 2012 (the time of the alleged infringement listed on Plaintiff's subpoena) was at least 1 in 10.  *Id.*

2

One IP Address for every ten Hotwire subscribers means that Hotwire had 4,700 IP Addresses available during the relevant time. And, there were only 50 unique IP addresses during the full calendar year between July 1, 2012 and July 1, 2013 that traced to Hotwire that infringed one or more of Plaintiff's works. *See* Declaration of Tobias Fieser ("Subsequent Fieser Decl."), at ¶ 27, Exhibit D. Thus, the odds that the same IP address was used by two different infringers is: 50 divided by 4,700 = 0.01063. In other words, 1 out of 100. However, the odds are actually significantly less because 50 unique IP Addresses represents an entire *year* of Hotwire Florida infringers – *not* the number of infringers between January 3, 2012 and May 29, 2012.

That "ten (10) of Plaintiff's 'copyrighted movies' did not exist on the date Plaintiff obtained its subpoena" is irrelevant. CM/ECF 54, at p. 2, 3. Defendant's IP Address was used to infringe Plaintiff's movies consistently from January 3, 2012 until May 29, 2012. CM/ECF 1-3. It makes no difference that some of the infringements occurred for movies created and released after the subpoena was "obtained." Reissuing a subpoena for each subsequent infringement of a new work would be a waste of the Court's, parties', and Hotwire's time and resources.

B.  There Are At Least 10 Different ".torrent" Files For Each of Plaintiff's Movies

Each of Plaintiff's movies is seeded at least 10 times. Put another way, at least 10 different .torrent files are created for each of Plaintiff's movies. *See* Exhibit E. Each copy that is associated with a .torrent file has a unique cryptographic hash value. Infringers can choose to participate in the swarm for any of those unique copies. It is analogous to a Walgreens that sells Excedrin. A person can buy the Excedrin from many stores. If IP Addresses were being swapped between infringers, then one would expect to see the same IP Address downloading *different* copies of the same movie. To continue the Walgreens analogy, if numerous thieves had copies of stolen credit cards in an area with 10 Walgreens, you would expect some of the thieves

3

to shop at different Walgreens than the owners of the credit cards. Significantly, that phenomenon has never happened. Instead, IPP's records demonstrate that all of the IP Addresses used by Hotwire's subscribers nationally always download the exact same copy of a movie, as evidenced by that copy's unique cryptographic hash value. Such is the case here. *See* Subsequent Fieser Decl., and CM/ECF 1-3.

        C.   <u>IPP's Technology Records the Exact Date and Time of the Infringement</u>

Defendant attempts to argue that there's no evidence that "sheds [] light on the accuracy with which IPP Limited can accurately track and record the <u>date and time</u> that a dynamic IP Address was used to infringe a work." CM/ECF 54, at p. 9 (underlining in original). IPP's technology was created such that it ensures that it records the correct IP Address on the exact date and time of the infringement. The following brief description of the technology explains the process:

The IP detection process begins when IPP's clients, here Malibu Media, provide IPP with the names of their copyrighted works. *See* Declaration of Michael Patzer at ¶ 7, Exhibit F. IPP's software then scans the index of torrent websites for possible matches using a lexical search. *Id*. at ¶ 8. If IPP's servers find a possible match, the computer file associated with the .torrent file is downloaded and the logging process begins. *Id*. at ¶ 9. After a possible match is found through a lexical search, IPP immediately starts downloading the computer file associated with the .torrent file, and logging transactions. *Id*. at ¶ 13. "Logging transactions" means that IPP's servers start requesting data from the possible infringers, and storing that information on a database server. *Id*. at ¶ 14.

IPP saves the transactions on a WORM tape drive. "WORM" stands for write-once-read-many, which means that one can only write to the tape drive once, but the tape drive can be

read many times. In this manner, modification of what is written onto the WORM tape drive is impossible. *Id*. at ¶ 15. The transactions are saved in a type of computer file known as a PCAP file. "PCAP" stands for Packet Capture, and the type of "packet" being captured is a data packet. *Id*. at ¶ 16. IPP uses a program called TCP-Dump to create PCAPs. TCP-Dump records all of the network transactions that a server receives and transmits. *Id*. at ¶ 17. In this manner, TCP-Dump works like a video camera recording all of the ins-and-outs of transactions to and from IPP's servers. *Id*. at ¶ 18. IPP also saves the downloaded computer files which correlate to the .torrent files onto the WORM tape drive. *Id*. at ¶ 19. <u>The WORM tape drives receive a time stamp issued by the German government. This time stamp is recorded on the WORM tape drive within twenty-four hours after a PCAP file is placed on the drive</u>. *Id*. at ¶ 20. This time stamp proves that the data was actually written at that time. *Id*. at ¶ 21. IPP uses approximately 150 servers and two tape robots. *Id*. at ¶ 22. In terms of security certifications, IPP fulfills the security standard used by companies for processing credit card data. *Id*. at ¶ 23.

It is important that IPP's servers have the correct time because ISPs use that data to correlate the alleged infringement to a subscriber. *Id*. at ¶ 24. <u>The clocks for IPP's servers are set using GPS time, as set by two dedicated GPS servers and by an atomic clock</u>. *Id*. at ¶ 25. <u>If the time for IPP's servers is different from either the GPS time or the atomic time by any more than one hundredth (0.01) of one second, IPP does not log the transaction</u>. *Id*. at ¶ 26. The specific length of time IPP's system is set up to maintain a connection during each transaction with an alleged infringer is <u>two seconds before and two seconds after data is transferred</u>. *Id*. at ¶ 27.

Accordingly, since the time for IPP's servers is never inaccurate by more than a hundredth (0.01) of one second, and IPP maintains connections for more than four seconds, the

5

ISPs are able to accurately correlate the detected infringement to a particular subscriber. *Id*. at ¶ 28. In sum, IPP connects with Defendant's IP address during each transaction for two seconds before the transaction and two second after the transaction and IPP uses both a GPS clock and atomic clock to ensure that the transaction date and time is accurate within one one-hundredth of a second. This process ensures that even if the IP Address is dynamic, it could not change during the logging process.

    C.    <u>Malibu Media Filed This Suit in Good Faith and With a Proper Purpose</u>

Prior to filing this suit, during the pendency of the Bill of Discovery suit, Plaintiff attempted to contact Defendant on April 6, 2012, April 10, 2012, April 17, 2012, May 21, 2012, June 4, 2012, and August 14, 2012 via telephone. *See* CM/ECF 47-6, Lipscomb Decl., at ¶ 7. Defendant's phone number was not disconnected until Plaintiff called on August 14, 2012. Hotwire notified Defendant of the subpoena in writing. *See* CM/ECF 47-10, at 79:15-19. Upon receipt, Defendant did not – but could have – called Hotwire to advise that his condo was unoccupied. Had he done so, Hotwire may have investigated or refrained from disclosing his identity.

Defendant spends the bulk of his objection attacking Plaintiff for not sufficiently notify him of the suit. But, Defendant omits that he knew of the suit before being served and chose not to do anything about it. Even defense counsel knew of the suit before Defendant was served. This is evident by defense counsel's bill, which begins on August 23, 2012. *See* CM/ECF 41-7. Defendant was not served until September 5, 2012. *See* CM/ECF 6. Therefore, either Hotwire's notification or Plaintiff's calls did reach Defendant and he chose to ignore them.

    D.    <u>Responding to Defendant's Motion to Dismiss Was Not Unreasonable</u>

6

1. Without First Talking to Plaintiff, Defendant Drafted a Frivolous 12(b)(6) Motion

Instead of calling undersigned to say: "You've got the wrong guy. My client was out of the country and his condo was empty" – which is what a reasonable and cost-conscious lawyer's first move would be – on September 21, 2012, Defendant filed a frivolous 12(b)(6) Motion. It was unnecessary because a simple verified answer and defenses would have communicated that Defendant was out of the country and his condo was empty.[1] It was frivolous because scores of identical Rule 12(b)(6) motions have been *universally* rejected.

2. Responding to a Motion to Dismiss is Not Unreasonable

Now, Defendant claims that Plaintiff's actual action of responding to the Motion to Dismiss he filed was improper. Plaintiff responded to the Motion to Dismiss in order to avoid its claims being dismissed while it attempted to determine what happened. This is not unreasonable. At the time, Plaintiff thought that someone else might have been living in Defendant's apartment and committing the infringement and Defendant knew who it was. Further, Plaintiff continued the case in order to depose Hotwire to figure out what went wrong.

E. Plaintiff Scheduled the Hotwire Deposition In Good Faith

Prior to the deposition, Plaintiff did not know that Hotwire only retained data for two months and in no way scheduled the deposition in bad faith. Defendant's attempt to suggest otherwise is without any basis in fact. Indeed, while Plaintiff knows that ISP's data retention

---

[1] Defendant also could have asked Plaintiff to stipulate to a motion to amend the Complaint and allow him to proceed anonymously. Plaintiff would have agreed. Lipscomb Decl., at ¶ 8. Indeed, Plaintiff has allowed other defendants to proceed anonymously even after naming them. *Id.*

varies, most retain it for at least six months.[2]  Given that Hotwire is a major ISP, Plaintiff would not have expected it to have this short of a retention period.

Further, Plaintiff had nothing to gain from losing the data retention period.  It is in Plaintiff's best interest to pursue its claims against the <u>actual infringer</u> and it is absurd for Defendant to suggest otherwise.  Indeed, if Plaintiff's goal was to hide the Hotwire error, Plaintiff simply would not have deposed Hotwire at all and dismissed the case earlier on.  And, throughout the entire course of this case Plaintiff represented to Defendant that once Hotwire explained what happened, Plaintiff would immediately dismiss Defendant.  Other than the email sent on March 21. 2013, Plaintiff's entire behavior has been consistent with this.  Defendant is twisting the facts in an attempt to receive fees without anything to actually support his conjecture.

As Plaintiff explained in its opposition [CM/ECF 47 at *5] Hotwire's deposition was rescheduled for March 13, 2013 to coincide with four other depositions undersigned took in another matter near Philadelphia.  Indeed, Plaintiff was preparing for litigation in the Bellwether Trial in the Eastern District of Pennsylvania.  Hotwires corporate office is just outside Philadelphia, PA.  It made sense for undersigned to schedule it the same week to avoid two trips.  At the time, undersigned had no idea it would affect the data retention rate.  Further, nothing stopped Defendant from subpoenaing Hotwire for any of the data during the course of litigation when the infringement was ongoing.  Plaintiff would not have opposed such a subpoena.

---

[2] http://torrentfreak.com/how-long-does-your-isp-store-ip-address-logs-120629/ (Verizon retains it for 18 months, Comcast 180 days, Time Warner up to 6 months, etc).

### III. ARGUMENT

#### A. Judge Simonton Correctly Analyzed That Fees Should Not Be Awarded Under the Copyright Act

1. Plaintiff's Subjective Motivation Was Proper

Each month, approximately 80,000 U.S. residents use BitTorrent to steal Malibu's movies. *See* CM/ECF 47-1, *Field* at ¶ 16. According to GQ Magazine, Malibu produces "perhaps the world's most sophisticated cinema erotica." *See* CM/ECF 47 at *1. To do so, it spends over two million dollars a year producing content, and millions more each year to run its business. *See* CM/ECF 47-1, *Field* at ¶ 14. Malibu Media has prevailed at trial. *See Malibu Media, LLC v. John Does 1, 6, 13, 14*, 2013 WL 3038025, *8 (E.D. Pa. June 18, 2013). Malibu distributes its product through a subscription based website, www.x-art.com. *See* CM/ECF 47-1, *Field* at ¶ 9. It makes the *overwhelming* majority of its revenue and profit from subscription sales. Malibu's principal owner testified that "Malibu has no desire to settle with innocent subscribers." *Id.* at ¶ 23.

Judge Simonton rejected the same arguments Defendant raises here noting, "Defendant has not provided a single communication from Plaintiff wherein it sought to settle this matter in exchange for thousands of dollars either before or after filing suit." *See* CM/ECF 53 at *7. As set forth above, all of Defendant's arguments regarding subject bad faith are without any actual basis. Defendant cannot claim Plaintiff failed to adequately contact him regarding the suit before serving him when he knew of the action filed against him and never contacted Plaintiff to assert his innocence. Defendant cannot demonstrate that Plaintiff pursued this lawsuit for any reason other than to pursue its lawful right to protect its copyrights. This is particularly true when Plaintiff never even asked Defendant to settle this matter in exchange for any monetary value.

9

Every settlement offer in this suit made to Defendant involved either walking away or Plaintiff paying Defendant.

2. Plaintiff's Complaint Was Not Frivolous

As set forth above, it was reasonable for Plaintiff to include the fourteen infringements in its Complaint. The infringement was ongoing and continuous and the likelihood that it was another individual using the same IP address to download the same exact content on such a consistent basis was exceedingly slim. To have proceeded as Defendant proposes would have been judicially inefficient. Indeed, Defendant would require that Plaintiff file a new lawsuit, and file a motion to subpoena Hotwire for each claim of infringement. This would be incredibly and inefficient waste of time for the Court, Plaintiff, and Hotwire when each response is highly likely to return the same subpoena response.

Further, Defendant's argument ignores that the problem in this case was not a dynamic IP address but that the building which Defendant lives in incorrectly wired the floors to accurately report information to Hotwire. It was not until the deposition that Plaintiff and Hotwire learned of this. Hotwire's 30(b)(6) deponent testified that the *only* way she was aware that a correlation error could occur was if a port on the group modem on Defendant's floor was mislabeled. *See* CM/ECF 47-10 Murphy Depo., pp. 39-50. To explain, the individual units in Defendant's building do not have modems provided by Hotwire. Instead, the modem for a floor is in a utility closet for that floor. And, wires from that modem's ports are run to the resident's individual units. A "mislabeled port" would cause Hotwire to identify Defendant instead of the infringing neighbor on his floor. *See* p. 39, lines 3-12. *See also* p. 49, line 7 through p. 50, line 7.

3. Plaintiff's Claims Were Objectively Reasonable

Plaintiff's filing suit against a serial infringer was clearly reasonable. And, deposing hotwire was also reasonable and advanced copyright's interests in accurate ISP correlations. To

10

detect and address digital infringements internet service providers, like Hotwire, must be able to accurately correlate an IP Address to a subscriber. Penalizing a Plaintiff for deposing an ISP who likely made a correlation error would deny the ISP the ability to take the necessary corrective measures brought to light by a deposition. Since the DOJ and civil plaintiffs rely on IP address correlation in copyright cases, an ISP's ability to correctly correlate is *clearly* in the interest of the Copyright Act.

Further, one of Malibu's purposes for taking Hotwire's deposition was to ascertain whether it could identify the serial infringer. This is reasonable because appreciating how an ISP may err assists plaintiffs and defendants' to analyze peer-to-peer copyright cases. Indeed, it may color a party's desire to proceed, enable plaintiffs and defendants to focus on discovery, or both. This furthers the Copyright Act's interests in identifying and deterring *infringers*.

Fed. R. Civ. P. 26(b)(1), permits discovery if "if it appears reasonably calculated to lead to the discovery of admissible evidence." Here, Hotwire's deposition was reasonably calculated to identify the infringer. Accordingly, awarding fees would undermine the Copyright Act's purpose of deterring infringement because, as the Register of Copyrights correctly opined, "for many people, the best form of education about copyright in the internet world is the threat of litigation."[3] Here, a fee award will dissuade copyright owners from investigating possible ISP errors who are doing so for the purpose of identifying the infringer. Copyright law is interested in identifying serial infringers, not in letting them remain unidentified.

4. <u>Considerations of Compensation and Deterrence Weigh in Favor of Plaintiff</u>

Defendant argues that this Court should award him fees in order to deter Plaintiff from pursuing default judgments in cases where Plaintiff may not have emailed a defendant prior to

---

[3] *Pornography, Technology, and Process: Problems and Solutions on Peer-to-Peer Networks Statement of Marybeth Peters The Register of Copyrights before the Committee on the Judiciary*, 108th Cong. (2003), *available at* http://www.copyright.gov/docs/regstat090903.html.

11

serving them with the Complaint. This argument is nonsensical. The Civil Rules of Procedure have set forth guidelines for Plaintiffs to file default judgment against defendants, including effectuating service of process. Plaintiff should not be held to a different standard than all other civil plaintiffs. And while Plaintiff may have filed a large amount of cases, this figure relates directly to the amount of infringement it experiences every month. The proliferation of these types of lawsuits would be expected given the alleged infringement by thousands of people. "The volume of lawsuits alone does not indicate any impropriety." *Patrick Collins, Inc. v. John Does 1-9*, 12-CV-3161, 2012 WL 4321718 (C.D. Ill. Sept. 18, 2012). Plaintiff only files suit against the worst infringers and under the Copyright Act, Plaintiff has a legal right to do so.

Defendant states that, "Plaintiff wasted time and resources that it could have spent tracking down the party actually responsible for the alleged infringement." CM/ECF 54 at *13. The only way to track down the infringer would have been through Defendant since Hotwire reported Defendant as the subscriber of the IP address. And then, the only way to learn why Defendant was not correctly identified as the infringer was by deposing Hotwire and learning of the error in Defendant's building. Plaintiff did everything possible in this suit to track down the infringer and proceed properly.

As stated in its opposition, Defendant's fees in this case were not proportionate to the amount of work required to defend the action. Undersigned has not found one case where considerations of compensation *alone* were sufficient to justify an award of attorneys' fees to a defendant. *See Alexander v. Chesapeake*, 60 F.Supp.2d 544 (E.D. Va. 1999) ("Consideration of compensation and deterrence does not suggest that attorneys' fees are appropriate. . . . [Indeed], the Defense of reasonable legal claims, under the so-called 'American Rule,' is in most instances

12

a cost of business.") The mistake as to the infringer was a result of Defendant's building misreporting, not any action by Plaintiff.

### B. Plaintiff Respectfully Disagrees With the Imposition of Sanctions Under 28 U.S.C. § 1927 But Does Not Contest the Court's Holding

The 11th Circuit has stated that "the plain language of the statute imposes three essential requirements for an award of sanctions under § 1927[.]" *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007).

> First, the attorney must engage in "unreasonable and vexatious" conduct. Second, that "unreasonable and vexatious" conduct must be conduct that "multiplies the proceedings." Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, *i.e.,* the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

*Id. citing Peterson v. BMI Refractories,* 124 F.3d 1386, 1396 (11th Cir.1997). As this Court has previously held, "the 'key for unlocking' the power to sanction under 28 U.S.C. § 1927, is a finding of bad faith." CM/ECF 53, at p. 13 citing *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, No. 09–60351–PAS, 2011 WL 4433570, *4 (S.D. Fla. 2011). Further, sanctions are discretionary and *may* be awarded by the Court although the Court is not *required* to award them. *See* 28 U.S.C. § 1927 ("Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously *may* be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.") (Emphasis added).

Defendant's objection argues that "a close review of the facts reveals that Plaintiff was – at all times in this proceeding – deliberately multiplying this proceeding and adding to the costs of the litigation for the sole purpose of advancing its own interests." CM/ECF 54, at p. 14. Plaintiff filed a factually supported copyright infringement complaint against one of the worst infringers in the world of Plaintiff's movies. Before filing suit, Plaintiff attempted to contact

13

Defendant six times over five months. During that time, the infringement continued unabated. The purpose of the lawsuit was to enjoin and seek compensation from the infringer. To the extent that these purposes may be considered as "advancing its own interests," Plaintiff had a reasonable, justifiable, and legally cognizable basis for suing and pursuing its claim.

Defendant's conclusory objection does not address the bad faith requirement of 28 U.S.C. § 1927. Plaintiff took numerous steps to demonstrate good faith towards Defendant throughout the litigation, such as: (a) advising Defendant that Plaintiff would *not* pursue a settlement; (b) advising Defendant *not* to spend money on the matter and that after the Hotwire deposition Defendant would likely be dismissed; (c) drafting the Rule 26(f) report and both motions to enlarge the time within which *Defendant* had to respond to the complaint to reduce Defendant's fees; (d) offering to voluntarily dismiss Defendant immediately after the Hotwire deposition; (e) genuinely attempting to compromise on Defendant's fee payment at mediation; (f) offering $13,000 for fees after mediation; and (g) offering to stipulate to dismissal with Defendant as the prevailing party. Although undersigned respectfully disagrees with the imposition of sanctions under Section 1927, undersigned appreciates and has learned from the Court's point of view and does not contest the Honorable Magistrate Judge Simonton's holding.

## IV.   CONCLUSION

For the reasons set forth above, awarding fees would not be consistent with the interests of the Copyright Act or equitable. Accordingly, Plaintiff respectfully requests that the Court deny Defendant's motion.

Dated: March 19, 2014

Respectfully submitted,

By: /s/ *M. Keith Lipscomb*
M. Keith Lipscomb (429554)
klipscomb@lebfirm.com
LIPSCOMB EISENBERG & BAKER, PL
2 South Biscayne Blvd., Suite 3800
Miami, FL 33131
Telephone: (786) 431-2228
Facsimile:  (786) 431-2229
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

By: /s/ *M. Keith Lipscomb*

15